IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| UNITED STATES OF AMERICA, | CR 12-16-M-DWM |
|---|---|
| Plaintiff, | |
| vs. | ORDER |
| MICHAEL ANTHONY WOHLMAKER, | |
| Defendant. | |

Michael Anthony Wohlmaker is charged with having a sawed-off shotgun that was not registered to him. 26 U.S.C. § 5861(d). He asks to supress evidence obtained by two police officers who entered his apartment, and then his bedroom, where they observed a shotgun that appeared to be shorter than is permitted under federal law. The police had no warrant to be in the apartment or in the bedroom. A hearing on the suppression motion was held on July 23, 2012.

One of the officers, Officer Hebert, testified for the government. Wohlmaker's then-roommate, Donald Larry Ritchie, testified for the defense. To the extent their testimony conflicts, Officer Hebert is more credible and his

description of the facts is accepted as credible. Ritchie has been on Social Security for several years due to cognitive or emotional disabilities that he described in court. Though his intentions were good, he admitted several times that he was confused and there were inconsistencies in his testimony. In contrast, Officer Hebert was truthful and he offered testimony that was consistent with the reports he and other officers filed last July.

The motion to suppress is granted for the reasons set forth below.

## STATEMENT OF FACTS

Michael Anthony Wohlmaker had a State of Montana medical marijuana patient card, but he became a criminal suspect when the Missoula Drug Task Force received information he was selling marijuana to other people.[1] Task Force officers obtained a warrant to monitor and record transactions between Wohlmaker and a confidential informant. They also observed Wohlmaker's apartment complex while monitoring the transactions that occurred there.

On June 15, 2011, Wohlmaker allegedly sold 28.8 grams of marijuana to the confidential informant for $235.00. On a second occasion, he allegedly sold him

---

[1]These facts are derived from Officer Hebert's Missoula Police report, doc. 15-2, Officer Hebert's testimony, and Special Agent Ramsey's summary report, doc. 15-1. The parties agree that Officer Hebert mistakenly refers to Wohlmaker as "George" in the section of his report describing the entry and search of the apartment.

2

or her two baggies that each weighed 29.9 grams. He was also heard claiming to have grossed $3,000.00 by selling marijuana and to have arranged large marijuana transactions for others, and he was heard discussing expanding the sales of marijuana into other parts of Montana. At some point in the investigation a confidential informant reported Wohlmaker had what appeared to be a sawed off shotgun in his apartment. Officer Hebert testified that state charges concerning the marijuana transactions were dismissed without prejudice.

On July 11, 2011, at about 9:00 a.m.[2], Missoula City Police Officers Hebert and Kruger went to Wohlmaker's apartment to interview him. Hebert testified that they only planned to talk with Wohlmaker; they had no plan to arrest him. Both officers were wearing plain clothes, but Hebert wore a black vest that carried his badge and had the word "police" written on the left breast and across the back in white letters. Ritchie testified the vest looked like a "bullet-proof vest"; Hebert characterized it as a tactical vest carrier. Kruger's police badge hung on a lanyard around his neck. The officers' guns were holstered and not likely in plain sight, though Ritchie thought otherwise in his confused testimony.

The officers knocked on the front door. After a short wait, "Donny" Ritchie

---

[2] Officer Hebert testified it was about 9:00 a.m. when they went to Defendant's apartment. His report says 11:00 a.m. 9:00 a.m. seems more likely given Defendant was still sleeping as was Ritchie.

3

answered. Officer Hebert knew that Ritchie had been Wohlmaker's roommate at the apartment for over two months and that Ritchie slept either in the first bedroom or on the couch in the living room. Officer Hebert testified that it is his practice to introduce himself and identify himself as a police officer when someone first answers a door. He then asked if Wohlmaker was home. Ritchie responded that Wohlmaker was in the apartment, but asleep. Hebert then asked Ritchie if they could enter the apartment and contact Wohlmaker. Ritchie said they could and let them in. He did not take them to Wohlmaker's room. He went to the living room and sat on the couch. The officers did not speak with him again.

Wohlmaker's bedroom was the second, south-most bedroom down a hall, an estimated 10–15 feet from the front door. The bedroom door was open. Officer Hebert went down the hall, and when he got close enough he could see Wohlmaker lying on his bed asleep; the bed was directly in front and a little to the right of the doorway. Hebert testified that he assumed the bedroom was Wohlmaker's and that he believed Ritchie usually slept on the couch.

Hebert then entered the bedroom; at some point, Officer Kruger did, too. Even though a confidential informant had previously told them that Wohlmaker had a shotgun, Officer Hebert testified that he was not in the kind of "tactical

4

mindset" where he felt he needed to conduct a protective sweep or look around corners before he entered the room. He did not see the shotgun at issue before entering the room.

Hebert went to the bed and stood next to it, near the foot. He woke Wohlmaker by speaking loudly. After a brief discussion, Officer Hebert asked Wohlmaker if he would come to the Missoula Police Department to speak with them. Hebert testified that it is his practice to tell a person whom he is not arresting that, "barring a dead body coming up," the suspect would be coming home after they talked at the station, that he is not arresting the person and he will not be arresting the person, that he just wants to talk. Wohlmaker agreed to go to the station. The officers waited for him to change into street clothes, and then walked with him to their unmarked car and drove him to the station, Hebert driving, Wohlmaker in the front passenger seat, and Kruger in the back seat alone.

While in Wohlmaker's bedroom, Officer Hebert saw "what appeared to be a short single-shot shotgun-type firearm with a pistol grip handle" as well as a box of shotgun shells in the southwest corner. (Doc. 15-2 at 6.) The shotgun was not visible from the hallway, and the officers did not see it until they entered the room. They did not seize the shotgun or anything else from the apartment at that time.

At the station, Wohlmaker was read his *Miranda* rights, which is the

common practice at the station, even when a person is not under arrest. He then spoke with the officers for 5–10 minutes, during which time Officer Hebert testified that they did not ask him about the shotgun they had seen. Wohlmaker at some point asked for an attorney when he was confronted with selling or distributing marijuana. The officers then left him in the interview room.

Before the interview, Wohlmaker was told the room was under video and audio surveillance, and he was advised of the engaged portable audio recorder on the table directly in front of him. After he invoked his right to counsel and the officers left him alone in the interview room, Wohlmaker began making phone calls. He asked someone to go into his bedroom and take something out of the room. He then stated, "They can't do anything with a shotgun." (Doc. 15-2.) In a second call, he said, "Hey can you go back there and get that outta my room and bring that thing that Jessie had me clean up back... it's sitting in the room, do you need a license for a shotgun or no?" (*Id.*) Though these calls were recorded, Officer Hebert does not remember listening to them at the time.

After leaving Wohlmaker in the interview room, the officers contacted United States Alcohol, Tobacco, and Firearms Special Agent Ramsey about the shotgun they had observed in Wohlmaker's bedroom. Ramsey came to the station and introduced himself to Wohlmaker. He told him he was interested in

6

inspecting the shotgun, and Wohlmaker agreed in writing to allow him to do so. Ramsey and Hebert then took Wohlmaker back to the apartment, where Ramsey photographed and inspected the shotgun. It was apparent to Ramsey that the barrel was shorter than the required length of 18 inches. He seized the gun and the shotgun shells.

## ANALYSIS

### I. Whether there was a Fourth Amendment violation

"[A]bsent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990) (internal citations omitted). If relying on consent, the government bears the burden of showing that the consent was voluntary and that the officers reasonably believed the person giving the consent had that authority to do so. *United States v. Patayan Soriano*, 361 F.3d 494, 504 (9th Cir. 2003).

To determine whether consent was voluntarily given, it is necessary to consider the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Relevant factors include whether the consenting individual was in custody; whether the arresting officers had their guns drawn; whether Miranda warnings were given; whether the consenting individual was told that he had a right to refuse entry; and whether the consenting individual was told that a search

7

warrant could be obtained. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). "These factors serve merely as guideposts, 'not [as] a mechanized formula to resolve the voluntariness inquiry.'" *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (quoting *Patayan Soriano*, 361 F.3d at 502).

Police may rely on the consent "of an occupant who shares, or is reasonably believed to share, authority over the area in common with [the defendant]," unless the defendant "is present at the scene and expressly refuses to consent." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). A person has actual authority to consent to the search of an area if he has mutual use and joint access or control over the area for most purposes. *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974). To assess whether a person has apparent authority to consent to a search requires consideration of three factors: 1) whether the officer believed some untrue fact that led him to conclude the third party had joint access or control over the area; 2) whether that belief was objectively reasonable under the circumstances; and 3) whether, if the reasonably believed but untrue fact were true, the consent-giver would have had actual authority over the area. *United States v. Ruiz*, 428 F.3d 877, 882 (9th Cir. 2005).

### A. The officers' entry into the apartment was permissible.

Ritchie's consent allowing the police to enter the apartment was voluntarily

given. Though the officers did not tell him that he could refuse their entry or that they could get a search warrant, they showed no force, did not have their guns drawn, and no credible evidence suggests any other threat or coercion. Ritchie was not in custody, so *Miranda* warnings were unnecessary and it would have made little sense to give them. *Patayan Soriano*, 361 F.3d at 504. Finally, Ritchie's consent was explicit. "[Officer Hebert] asked Ritchie if he could enter the apartment and contact [Wohlmaker]; [Ritchie] stated [he] could." (Doc. 15-2 at 6.)

Ritchie had actual authority to allow the officers to enter the apartment without a warrant, and the officers reasonably believed he had that authority. Officer Hebert knew from his investigation that Ritchie was an occupant of the apartment and had been for at least two months. Though Ritchie was not the leasee, the facts known to the police made it reasonable to believe he enjoyed mutual use and joint access or control over the entry and common areas of the apartment. *Matlock*, 415 U.S. 164, 171 (joint occupancy and use, not a mere property interest, determine whether a person has common authority). The officers' entry into the apartment did not violate the Fourth Amendment. They did not use force to push the door open nor did they reject any effort Ritchie claims took place to keep them out.

## B. The officers violated the Fourth Amendment when they entered Wohlmaker's bedroom without consent or exigency.

The Ninth Circuit "[has] never sanctioned entry to the home based on inferred consent in the absence of a request by the officers or ongoing, affirmative cooperation by the [consenting individual or] suspect." *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008) (internal quotation marks and citations omitted). *See also United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991) (holding that a wife's permission to enter a house does not, without more, include permission to enter a bedroom occupied by a sleeping spouse) (abrogated on other grounds by *Koon v. United States*, 518 U.S. 81, 100 (1996), *United States v. Daas*, 198 F.3d 1167, 1180–81 (9th Cir. 1999)). Ritchie had authority to consent to the officers' entry into the apartment to see Wohlmaker, then he went and sat down on the couch in the living room, saying and doing nothing further. He did not give them permission to enter Wohlmaker's bedroom, and they did not attempt to ask him for consent or determine if he had the authority to use or have access to Wohlmaker's bedroom.

Even if Ritchie had consented, he did not have authority to consent to allow the officers to go in to Wohlmaker's bedroom without a warrant, and no facts suggest the officers reasonably believed he had that authority. Warrantless entry

is unlawful "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry" into whether an area is subject to mutual use. *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992). It is unreasonable to believe, without other facts, that a co-tenant who appears to sleep on the couch enjoys common authority over another tenant's bedroom. *United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999) ("[A] simple co-tenant relationship does not create a presumption of control and actual access would have to be shown.") (citations omitted); *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) ("Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms, without explicitly making this expectation clear to one another.") (citation omitted); *United States v. Heisman*, 503 F.2d 1284, 1287 (8th Cir. 1974) (co-tenant did not have the authority to consent to a search of the defendant's private bedroom even though the bedroom did not have a door). Officer Hebert believed Ritchie slept on the couch and was merely a co-tenant, and he believed that the bedroom in which Wohlmaker was sleeping was Wohlmaker's alone. Ritchie lacked either actual or apparent authority to allow the police to enter Wohlmaker's bedroom.

Wohlmaker could have consented, but he was asleep. The officers entered his private bedroom anyway, without a warrant, without exigency, and without

consent or permission. In doing so, they violated the Fourth Amendment.

## C. The shotgun

The officers only saw the shotgun when they were illegally in Wohlmaker's bedroom. This is so by virtue of Officer Hebert's testimony that the shotgun was not visible from the hallway. Under the plain view doctrine, an officer must have a legal right to be at the location from which he viewed the object. *Horton v. Cal.*, 496 U.S. 128, 136 (1990). If the "initial intrusion" is illegal, the subsequent seizure may also be illegal, unless the subsequent search is sufficiently attenuated from the initial intrusion. *Id.* Even if consent is later given to a search, the consent may be tainted and invalid because of the illegal entry. *United States v. Furrow*, 229 F.3d 805, 813–14 (9th Cir. 2000); *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir. 1990); *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987). A party who witnessed the illegal entry "might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out." *Furrow*, 229 F.3d at 814. "Dissipation of the taint resulting from an illegal entry ordinarily involves showing that there was some significant intervening time, space, or event." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (internal quotation marks and citation omitted).

Here, the officers committed a constitutional error when they entered Wohlmaker's bedroom. He was present when they observed the shotgun in plain view. They took him back to the station and after talking to him for a short time, contacted Agent Ramsey based on their observation of the shotgun. A short time later Ramsey obtained Wohlmaker's consent to inspect the firearm. There was no significant intervening time, space, or event that would purge the taint from the initial constitutional transgression. Having just witnessed the illegal intrusion, Wohlmaker likely believed that refusing consent was pointless, and accordingly, his consent was not valid.

### D. Seizure

"For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (citation omitted). Whether a seizure took place requires taking into account the totality of the circumstances, and considering whether a reasonable person would have believed he was "not at liberty to ignore the police presence and go about his business." *Id.* (internal quotation marks and citation omitted).

The facts here are certainly not as egregious as those in *Kaupp v. Texas*, 538

U.S. 626 (2003), in which a 17-year-old boy was awakened in his bedroom at three in the morning by police who handcuffed him and took him to a patrol car wearing only his underwear. But the facts are similar to those in *United States v. Mejia*. In that case, Mejia's wife invited police officers into their home. *Mejia*, 953 F.2d at 466. She told them that Mejia was present, but sleeping in the bedroom. *Id.* at 463. The police asked her to wake him up, and she walked to the bedroom where he was sleeping. *Id.* They accompanied her, and followed her into the bedroom. *Id.* She awoke Mejia. *Id.* The officers identified themselves and asked Mejia if they could talk in another room. *Id.* Mejia argued that their presence in his bedroom constituted an illegal arrest because "a person who is awakened in his bedroom at 9:30 P.M. and finds two plainclothes investigators who identify themselves as police would believe that he was not free to leave." *Id.* at 467.

However, the court found that "[a] reasonable person in Mejia's position would have felt free to leave, or, more reasonably, to have asked the officers to leave the bedroom or to leave the house." *Id.* This case is different in that the police were not legally in Wohlmaker's bedroom, but the evidence shows his consent was still, like Mejia's, voluntarily given. As in *Mejia*, the police wore plain clothes and did not did not touch Wohlmaker or demonstrate force or draw

14

their weapons. Though they did not inform Wohlmaker that he could ask them to leave or decline to accompany them, they did ask him if they could talk elsewhere, at the police station, and told him that he was not under arrest and he would not be arrested. They then waited until he was ready to go before driving with him to the station. A reasonable person would have felt free under these circumstances to ask the police to leave his bedroom or to leave the apartment. His consent to go to the station was freely given, and he was not seized.

## II. Whether suppression of the fruit of the illegal intrusion is appropriate under the Exclusionary Rule

Even where evidence is obtained through a violation of the Fourth Amendment, suppression is not automatic. *Herring v. United States*, 555 U.S. 135, 140 (2009) (citation omitted). The exclusionary rule is a "prudential doctrine...created by [the United States Supreme Court] to compel respect for the constitutional guaranty" of the Fourth Amendment. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks and citations omitted). Its "sole purpose is to deter future Fourth Amendment violations." *Id.* A court must weigh the deterrence benefits of exclusion against the "substantial social costs" generated if a guilty person is released into the community. *Id.* at 2427; *Hudson v. Mich.*, 547 U.S. 586, 591 (2006); *Herring*, 555 U.S. at 141. The policy is one of general

deterrence, not necessarily specific deterrence.

Where police act in objectively reasonable good-faith belief that their conduct is lawful, based on a statute, case law, a warrant, or paperwork that is later found to be incorrect or to violate the Fourth Amendment, the exclusionary rule does not apply because the deterrent value is low. *Davis*, 131 S. Ct. at 2427–28 (citing cases involving good-faith reliance). On the other hand, where the police deliberately and flagrantly violate the Fourth Amendment, suppression does have a deterrent effect which may outweigh its costs. *Herring*, 555 U.S. at 143–144. The standard is objective, not subjective, but an officer's knowledge and experience may be considered. *Id.* at 145. "It is the government's burden to show that evidence is not 'fruit of the poisonous tree.'" *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011). In this case such a showing was not made.

Here, the officers did not rely on any statute, case law, warrant, paperwork, consent, or other belief that would justify their intrusion into Wohlmaker's bedroom. Case law unquestionably establishes that a person has a legitimate expectation of privacy in his own bedroom, and that only a person with apparent or actual authority may consent to a search of that bedroom. It is also firmly established that consent to search a house or apartment does not extend to others' private bedrooms within that house, unless the consenting individual has joint

16

access and control of the room. *E.g. Mejia*, 953 F.2d at 466. Nonetheless, the experienced officers in this case entered the bedroom they believed to be Wohlmaker's without a warrant, without consent, and without exigent circumstances. They did not attempt to ask Ritchie for permission to enter Wohlmaker's bedroom, and they did not ask if Ritchie had authority to give such consent. Nor did they attempt to wake Wohlmaker from the hallway to obtain his consent to enter.

The deterrence value of suppression in this case is clear, while the social costs of suppression are low. Wohlmaker could face other charges and has been released on his own recognizance for over a year. Police officers cannot justify peering in every private area of a shared home when consent has only been obtained to enter the common areas. Permitting such activity—which is in clear violation of the Fourth Amendment—would have a high social cost and impact on individuals' legitimate expectation of privacy in their own bedrooms. Thus the evidence that directly and indirectly derived from the officers' illegal intrusion must be suppressed.

## CONCLUSION

The difficult question here is what must be suppressed. It is appropriate to exclude the observations that Officers Kruger and Hebert made when they were

17

illegally in Wohlmaker's bedroom, including seizing the shotgun and the shotgun shells. In addition, anything Wohlmaker said to Agent Ramsey, and Agent Ramsey's subsequent inspection and seizure of the shotgun, must be suppressed because the interview and search and seizure of the shotgun were based on the initial illegal intrusion and the government has not met its burden of showing that the subsequent search and seizure were sufficiently attenuated from the intrusion so as not to warrant suppression. *Shetler*, 665 F.3d at 1159. Though there is no evidence the Missoula police officers asked Wohlmaker about the shotgun, Wohlmaker was in the room when they saw it, and they only spoke with him for a few minutes at the station before contacting Agent Ramsey about it. *Id.* at 1158. Wohlmaker's interview with Agent Ramsey was likely influenced by his knowledge that the officers had already seen the shotgun. *Id.* With no intervening circumstances that break the causal chain, the evidence is fruit of the poisonous tree and, because the deterrence benefits in this instance outweigh the social costs of suppression, evidence of the entire sequence must be excluded. However, because Wohlmaker was not seized and he consented to come down to the station, his statements to Officers Hebert and Kruger are not suppressed, nor are the statements he made while alone in the interview room.

IT IS HEREBY ORDERED that Wohlmaker's Motion to Suppress (doc. 14)

is GRANTED. Anything Officers Hebert and Kruger observed while illegally in Wohlmaker's room, including the shotgun and shells, are excluded, as are Wohlmaker's statements to Special Agent Ramsey, and the results of Ramsey's subsequent search and seizure including the shotgun itself.

Dated this 24th day of July 2012.

_____
Donald W. Molloy, District Judge
United States District Court